### BACON v. NEILL.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1922.)

No. 3773.

1. **Joint adventures** ⊙⇒5(2)—**Allegations of fraudulent misrepresentation of property held not sustained by evidence.**

Evidence *held* not to sustain allegations of a bill that in his report to complainant respecting mining property, which defendant had gone to examine under an agreement that they should purchase it jointly, if found valuable, defendant fraudulently misrepresented the facts, and misled complainant as to the value of the property, which was afterward acquired by defendant with others.

2. **Mines and minerals** ⊙⇒50—**Complainant held barred by laches from recovery of an interest in mining property.**

Complainant *held* barred by laches from maintaining a suit to recover a half interest in mining property which with his knowledge had been acquired by defendant and others more than two years before, and had been developed by them at large expense until it had been proved a very valuable property, and where he also had knowledge, or means of knowledge, during that time of the facts relied on.

Appeal from the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Suit in equity by Maurice W. Bacon against R. K. Neill. Decree for defendant, and complainant appeals. Affirmed.

Geo. W. Korte, of Seattle, Wash., and E. J. Cannon and Lee & Kimball, all of Spokane, Wash., for appellant.

Turner, Nuzum & Nuzum and Wakefield & Witherspoon, all of Spokane, Wash., for appellee.

Before MORROW and HUNT, Circuit Judges, and DIETRICH, District Judge.

MORROW, Circuit Judge. The appellant in this case, Maurice W. Bacon, was plaintiff in the court below in an action against the defendant, R. K. Neill, to recover on one-half interest in certain mining properties located in the mining district of Stewart, in British Columbia, and for an accounting.

Plaintiff alleges, in his amended complaint, that he is a mining engineer, engaged in promoting, financing, and management of mining

---

⊙⇒For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

properties in United States and Canada; that the defendant is, and has been, an expert and skilled prospector and mining promoter in the same territory; that on or about the 1st day of November, 1915, at Spokane, Wash., plaintiff and defendant made an agreement whereby it was orally agreed that they would engage together, in the United States and the Dominion of Canada, in the business of prospecting for locating and discovering mining properties, which it was so agreed they should handle and own together, share and share alike, and by the terms of this agreement the defendant agreed to investigate mining prospects and properties in United States and the Dominion of Canada, and report the result of his investigation in detail to the plaintiff. If there appeared merit in the properties, they were, by said agreement, to be acquired by location or purchase, and later financed, operated, controlled, or sold, as might appear to the mutual benefit of plaintiff and defendant, each in an undivided one-half part or share or interest therein, and the proceeds, if later operated or disposed of; that under this agreement defendant prospected and examined several properties from time to time; that in June, 1916, plaintiff learned from one Pat Daly, then in Spokane, of the mining district in British Columbia near Stewart; that plaintiff and defendant agreed that defendant should go, without delay, and investigate said district; that such investigation should be made for the benefit of plaintiff and defendant, and reported to the plaintiff, and, if favorable as to the prospect of mine, the control and ownership of such property or mine should be obtained for the mutual advantage of both; that the defendant desired money to be used in his investigation, and thereupon plaintiff advanced him $3,-000; that defendant went to said mining district and investigated the Daly property, and also another property, known as the Bush property; that defendant discovered that the Bush property was of great value, and could be purchased reasonably for a small sum of money; that, contrary to his duty to plaintiff, defendant concealed from plaintiff the true character and value of the property, and made untrue oral representations to plaintiff as to the character and value of said property; that the ore in the mine was low grade and of little value; that it was so inaccessible as to make the mining thereof extremely expensive; that such statements were made to plaintiff for the purpose of misleading him; that plaintiff relied upon such statements, and believed that said property was of no value; that thereafter, during the existence of the agreement, the defendant secured an option, lease, and bond upon said property, and proceeded, with associates, in the development, management, and control of said property, and he, with others, secured said property for their benefit; plaintiff is informed and believes that said property is of the value of $10,000,000, and that the defendant has obtained at least one-quarter of the same; that at no time has defendant advised plaintiff of his transactions whereby he has secured title to said property, or the purchase and development of the same; that plaintiff was in total ignorance of all of said facts until the 1st of October, 1919, when he learned thereof through the public press; that plaintiff has at all times been ready and willing to furnish defendant with the necessary funds to carry on the said joint enter-

prise; that defendant has failed to report or account for the funds furnished, as stated in the complaint; on the contrary, he has proceeded secretly, fraudulently, and unlawfully with the expenditure of the moneys so furnished on his own account, and not upon the mutual account of plaintiff and defendant. Plaintiff demands an accounting from the defendant for a full one-half interest in said property and conveyance of same to the plaintiff, and such other and further relief as may be deemed just and equitable.

The defendant, in his amended answer, denies the general terms of the agreement as alleged in plaintiff's complaint, but admits that both plaintiff and defendant learned of the Daly property, in the mining district of Stewart, in British Columbia, and that there was an oral agreement that defendant should visit that property and investigate its merits, and, if defendant reported favorably, the property should be acquired for the benefit of plaintiff and defendant upon the terms alleged in the complaint. Defendant admits that he visited the Daly property in British Columbia, and that he made an examination of that property, and also another property contiguous thereto; that he discovered and believed that the said last-named property was a valuable prospect, and well worth acquiring with a view of developing, and that the same could probably be acquired for a reasonable sum of money, and he so reported to the plaintiff. Although he had not examined the said property under any contract between himself and plaintiff, and was under no obligation or duty to plaintiff with reference thereto, defendant admits that he advised the plaintiff that he considered the property a valuable one and well worth acquiring, and asked the plaintiff to join him in acquiring same on the terms agreed on with reference to the Daly property; that plaintiff then and there declined and refused to join the defendant in acquiring the said property, alleging that the climatic conditions were unfavorable to mining, that the grade of the ore as disclosed by assays of the samples was too low, and that the camp was an abandoned camp, and had been turned down by all reputable and competent mining engineers who had examined same; that plaintiff persisted in his refusal to join the defendant in acquiring the other property, although repeatedly urged by defendant to do so. Plaintiff did not rely alone on the information furnished by the defendant, but had in his possession the report of an agent of his own, Mr. R. R. Ronnsavell, concerning said property, who had accompanied the defendant on his visit, and who participated in the examination of the property, which report was in substantial accord with that made by the defendant; that, upon refusal of the plaintiff to join him in the acquisition of said property, defendant, who was a man of small means, and unable, by reason thereof, to purchase said property on his own individual account, reluctantly gave up the project of acquiring said property with the plaintiff for the joint benefit of both of them, and it was not until nine months thereafter, and until defendant had been able to interest other people in said property, that the defendant took a contract from the owners of the property for the purchase of the same for the consideration of $100,000, the interest of the defendant therein being one-quarter interest, while the other parties that defendant had

been able to interest in the deal reserved to themselves a three-quarters interest.

Defendant admits that at a later period, to wit, in the month of March, 1917, defendant received an option, lease, and bond upon the said property. He then proceeded, with his associates, in the development and control of same, and that he has since purchased and secured said property for his own and his associates' benefit; the interest of the defendant therein being one-quarter interest. The defendant denies that his action in the premises was a violation of any agreement with the plaintiff, or while any agreement between plaintiff and defendant subsisted. Defendant denies that the property is of the value of more than $10,000,000, but is informed and believes that the said property is of value of not less than $2,500,000. He admits he did not advise plaintiff of his accounts and transactions whereby he secured title to the property, or the purchase or development of same. He says that he was under no obligation to do so, because of the facts set forth and alleged.

Defendant denies that it was agreed that plaintiff should advance the defendant, on account of the agreement, the sum of $3,000, and that the plaintiff did, on the 17th day of June, 1916, or at all, advance the defendant, on account of said agreement, or otherwise, the sum of $3,000, or any sum, but alleges the fact to be that the only agreement between plaintiff and defendant about money was that defendant should proceed to the said mining district and examine and report on the mining claim of the said Daly, and that plaintiff should pay the expenses incurred by defendant in proceeding from Spokane to said mining claim and returning therefrom and examining the same, and that plaintiff, although advised by defendant of the amount of money expended by defendant in and by said matter, has failed and refused, and still fails and refuses, to pay defendant the said sum, or any part thereof.

Defendant sets up the affirmative defense that at all times since defendant has acquired an interest in said mining claim in March, 1917, the plaintiff has been fully informed of defendant's interest in such property, of the expenditure by him of his time and money in the development of the same, and never, at any time until the bringing of this suit on December 4, 1919, and after the value of said mine had been demonstrated by defendant and his associates, has plaintiff asserted any claim or interest therein. Wherefore defendant charges that plaintiff is estopped by his laches to now maintain this suit. Defendant further alleges that under the statute of frauds of British Columbia and under the mining laws thereof, relating to miners' certificates, the alleged agreement between the plaintiff and defendant was illegal and void, and unenforceable in any court in the United States.

The case was tried in open court by the District Judge, who, at its conclusion, rendered an opinion fully reviewing the issues and the evidence in their support. The case was brought here by the plaintiff upon a statement of the evidence under rule 75 of Rules and Practice in Equity.

[1] We do not think it necessary to dwell upon the question whether the terms of the original agreement between the plaintiff and defendant

included the property here in controversy. It is sufficient that both parties treated it as within its terms. The real question is whether the defendant, in reporting upon the property, deceived the plaintiff as to the assayed values of samples of ore taken from the mine.

But before proceeding to consider that question, we will examine a preliminary question involved in the allegation of the plaintiff that "on the 17th day of June, 1916, pursuant to said agreement," he "advanced to said defendant, on account of said agreement, the sum of $3,000." This allegation is specifically denied by the defendant. He alleges the fact to be:

"That the defendant should proceed to the said mining district and examine and report on the mining claim of the said Pat Daly, and that plaintiff should pay the expenses incurred by defendant in proceeding from Spokane to said mining claim and in returning therefrom and in examining the same, and that plaintiff, although advised by defendant of the amount of money expended by defendant in and about the said matter, has failed and refused, and still fails and refuses to pay defendant the said sum expended by him, or any part thereof."

The payment of $3,000 to defendant was involved in another transaction. Defendant testified that he had a transaction with the plaintiff concerning the stock of a company referred to as the Hudson Bay Company. Both plaintiff and defendant were interested in that company. The defendant, on June 6th, gave to the plaintiff an option on 10,000 shares of the stock of that company, at $3 per share. This option is confirmed by a letter in the record, dated June 8, 1916, addressed to plaintiff and signed by the defendant, as follows:

"I beg to hereby authorize you to sell for my account 10,000 shares of the capital stock of the Hudson Bay Zinc Company, Limited, at a price not less than $3 per share, as promptly as you may be able, and I will give you orders upon the Empire Trust Company therefor when sold."

On the same day defendant gave to the plaintiff an acknowledgment and receipt of an order "upon the Empire Trust Company for 60,000 shares of the capital stock of the Hudson Bay Zinc Company, Limited, being in full settlement of my interest from you in this company." Plaintiff was to pay $3,000 in 10 days, and the balance in 30 or 40 days. On June 17th the plaintiff deposited the sum of $3,000 to the defendant's credit in the Fidelity National Bank of Spokane.

Under date of July 10, 1916, the defendant gave the plaintiff the following order:

"This is an order for 1,000 shares of Hudson Bay mine that belongs to me that is now in pool, Empire Trust Company of New York. This is according to the option given to you the 8th of June; 10,000 shares at $3 per share. This will be your receipt for $3,000 paid into the Fidelity National Bank June 17th to my credit."

This transaction and the evidence relating thereto accounts for the payment of $3,000 to the defendant as a separate and distinct transaction, unconnected with the expenses attending the examination of the Daly mine in British Columbia.

With respect to the expenses connected with that examination, there is no pretense that it was estimated to cost $3,000, or any sum ap-

proaching that amount. The defendant testified that before leaving Spokane he asked the plaintiff to give him $500 for the trip. Plaintiff said that was a big amount. He was willing to give the defendant $250, and he did so. He said nothing about having already advanced $3,000.

After defendant returned from British Columbia, he rendered a bill in detail to plaintiff for his expenses, amounting to $375. This balance the plaintiff never paid. The bill is in the record, and is dated July 12, 1916. Plaintiff never demanded an accounting of the defendant for the balance, or for its return, as he undoubtedly would have done if his claim that he had already advanced $3,000 was true. The evidence upon this question contradicts plaintiff's testimony so directly and conclusively that it discredits his testimony in support of his claim that defendant deceived him as to the result of his examination of the mine he had inspected in British Columbia.

In what way was he deceived? The agreement between the plaintiff and defendant with respect to an examination of certain mining property at the head of the Portland Canal in British Columbia had its inception in a conference in Spokane in the early part of June, 1916, between the plaintiff and defendant and one Pat Daly; the latter having a mining claim in that district which he was offering for sale. An option was taken on this claim by the plaintiff and defendant in the name of the latter, and he was to proceed, with one R. R. Ronnsavell, an employee of the plaintiff, to the locality where the claim was situated, and examine it as to its character and value, and report to plaintiff. The plaintiff did not intend, however, to rely alone on the information that would be furnished by the defendant, for Ronnsavell was plaintiff's agent and was to participate in the examination.

Defendant, with Ronnsavell and Daly, visited the claim, and upon examination it was found unsatisfactory. Thereupon they examined another claim, designated as the Bush claim, in the immediate vicinity of the Daly claim. The examination occupied three or four days. They took 31 samples of ore from this claim. Upon their return, Ronnsavell wrote to the plaintiff from Anyox, B. C., under date of July 3, 1916:

"Thirty-one samples property looks good, but impossible to tell until assays and mill test made. Mr. Neill figuring on going through to Spokane and will probably have assays run there."

Coming down on the boat, Ronnsavell and defendant each wrote out reports to the plaintiff of their work of examination. Ronnsavell described the Bush property in detail and referred to its development by others who had examined it. He says:

"From the work done it appears that they have spent in the neighborhood of $25,000; were given a six months extension of time on their bond to complete work which they had undertaken and have finally thrown it up. * * * From all appearances the property, if the values stand up, is an enormous one. The vein has been disclosed for a length of approximately 1,100 feet, and is approximately 150 feet in width at points shown up."

The Ronnsavell report was accompanied by diagrams, referred to as plates, describing the mine and the locality in the mine where the sam-

ples had been taken. He also described the general character of the property and its location. In a letter addressed to Ronnsavell at Vancouver, dated July 10th, the plaintiff acknowledged receipt of this report and sketches of Bush property, advising:

"That these are very thorough and complete and gave me a very good understanding of the situation. For your information, I am inclosing copy of assays as received."

In a postcript he says:

"Assays average only $4 and we shall not proceed therewith."

Under date of July 6th, the defendant reported to plaintiff as follows:

"We are just getting back to Vancouver. I am going to Seattle by this same boat. I am planning to be in Spokane Saturday morning, and not later than Sunday morning. P. Daly showing was still covered with a big snowslide. While there we sampled another property that looks like a dandy. I will tell you all about when I get my samples assayed. I am expressing nine samples over to the Stowell Drug Company. If they assay high enough, I will have the balance assayed when I reach Spokane.    *    *    *

"P. S.—Mr. Ronnsavell is all O. K. Will mail you the particulars to-morrow, giving cuts, tunnels, and the length of the ore body."

Under date of July 7th, Ronnsavell wrote from Vancouver to plaintiff as follows:

"Mr. Neill left for Seattle yesterday, and expects to arrive Spokane Sunday morning. A number of samples taken from tunnels went forward by express, Great Northern, yesterday, consigned to Stowell Drug Company of Spokane for assaying. They should arrive to-morrow (Saturday) morning. Mr. Neill will have the balance of samples run, which he took with him, if tunnel samples stand up."

These letters fully disclosed to plaintiff that defendant was returning with 31 samples of ore from different parts of the Bush mine, and that, in his opinion, the property looked like a dandy. The defendant was sending 9 samples of ore by express to be assayed. If they assayed high enough, he would have the balance assayed when he reached Spokane. The plaintiff does not contend that there was any deception in the information contained in these letters, or in the Ronnsavell report.

When defendant reached Spokane on Saturday morning, July 8th, he discovered that the 9 samples forwarded by express had not arrived, and he thereupon had an assay made of the remaining samples, which he had brought over with him. On the evening of July 8th these latter samples had been assayed, and the certificate handed to the defendant. Mr. Ronnsavell's report had been received by the plaintiff. The defendant testified that he went over that thing with the plaintiff in a careful way; that the assays of the samples which defendant had brought with him were on three sheets. He said he showed these three sheets to the plaintiff, and discussed with him about the mine with reference to those samples; that they went over the whole situation, and discussed it in every way, shape, and manner. He told the plaintiff that the report was that Mr. Thompson, of New York, and Mr. Aldrich had spent a lot of money there and had given it up. Plaintiff immediately said:

"I can't handle this thing in New York, if it is well known to be thrown up."

The plaintiff also objected that the valley flooded, and was a turned-down property, and the country was condemned, and he said:

"You know I agreed to follow you up to Prince Rupert a week later, after you left here. I did, and I heard the country was an old turned-down country, and it was a country that you could not operate in at a profit."

Defendant told plaintiff about the cost of the road; to build all of those things was brought in, as is customary when talking with the man that is going to finance a proposition. Defendant urged plaintiff to proceed to finance it. Plaintiff's principal objection was that the valley flooded, and that it was turned-down property, and the country was condemned. The fact that the property had been turned down by previous prospectors was in the Ronnsavell report.

The plaintiff testified that he received the defendant's letter of July 6th soon after its date; also the Ronnsavell report of July 7th. Defendant arrived in Spokane on Saturday or Sunday. The plaintiff was quite sure it was Saturday. He had a conversation with defendant over the telephone. Plaintiff testified further as follows:

" * * * He told me about their trip in a general way; that they had had quite a strenuous trip, and that the Daly property was not examined on account of the snow, and he did not think there was anything up there, and that it was under a glacier, but, as he wrote me from the boat, they had examined another property which had a great big ore body in it which he had sampled, and that he would not know definitely whether it was good or bad until he had received his assays, but at that time the samples had not arrived, and that he could not report fully until they did arrive. * * * I saw Mr. Neill on Monday. When he came to the office Monday, I had this telegram from Mr. Ronnsavell about the samples, and he (the defendant) advised me that the samples had arrived. * * * That morning [Saturday morning] that I and Mr. Neill had our conversation relative to what was done up there, he walked into the office, and he laid down one assay certificate, and walked over to the window, and he says: 'It is too bad; it don't stand up; the property is no good; we cannot do anything with that ore.' And I' says: 'Well, do you mean to say that Mr. Daly is working under an hallucination?' 'Well,' he says, 'that sheet shows the best of it, and I don't think it is worth while to run any more of them, and unless you want it done I won't have it run.' I said to him there was no use in assaying waste; if that was all there was there, not to run any more. He showed me that sheet, dated July 10, 1916, that you have. * * * Mr. Neill never showed me at any time any other assay sheets. We had some further conversation relative to the milling possibility of this ore as displayed on this sheet. Mr. Neill also had some chunks of rock with him, some silver ore with him, which did not show any high-grade ore. He says: 'This is the kind of stuff there is there.' And I talked to him about the possibility of milling it, and he said that the milling possibility, the concentrating possibilities, were not good, because it did not carry any base minerals; that is, lead or zinc, and that the values were too low grade to make a profitable profit without an excellent concentration. We even talked about the possibility of whether or not to run any concentrating tests on it, and it was decided not to do so, on account of the low tenor of values in the ore as shown by this sheet. * *. * We had no further conversation about what we should do with that property on that occasion, except to drop it; that we would have to hunt for something else. We did have conversation as to what we should do under agreement to find another mine. * * *"

The three assay sheets, dated July 8th, showing the assays of the 23 samples of ore brought to Spokane by the defendant himself, stated the assay values per ton of 2,000 pounds in silver and gold as follows:

First sheet, eight samples, average per ton, $8.84; second sheet, eight samples, average per ton, $15.79; third sheet, seven samples, average per ton, $3.93.

The plaintiff testified that he did not see these last-named sheets. The single sheet, dated July 10th, showing the same data concerning the 9 samples of ore sent down by the defendant by express, showed an average value of $3.30 per ton. Plaintiff testified that this was the only sheet defendant exhibited to him. Referring to certain of the assays contained in the three sheets, plaintiff testified that, had he had them before him, he would not have turned that mine down.

We have now reached the crucial question involved in this controversy. Did Neill, on his return from the examination of the Bush mine, conceal from plaintiff the three assay sheets dated July 8th, showing the assays of the more valuable samples of ore, and exhibit to him the single sheet, dated July 10th, showing the assays of the less valuable samples of ore? The only misrepresentation or concealment claimed by the plaintiff in his final testimony was the withholding by the defendant of the assays of the more valuable samples shown on the three assay sheets.

The plaintiff knew that 31 samples of ore had been taken from different places in the Bush mine. He knew that 9 of these samples had been sent down from Vancouver by express, and that the defendant had brought down the remainder (22 or 23) himself. He knew that the single sheet showed only the 9 assays. Is it reasonable to suppose that plaintiff would, under the circumstances, have been satisfied with the assays of the 9 samples, when the remaining samples were at hand, as the plaintiff knew, and as we now know, from the date of the assay, had been already assayed on Monday? Would not the plaintiff have naturally and reasonably called for the assays of the remaining samples?

Both the defendant and Ronnsavell had reported favorably to the plaintiff on the general features of the mine. Ronnsavell, three days before, had written to plaintiff:

"From all appearances, the property, if the values stand up, is an enormous one. The vein has been disclosed for approximately 1,100 feet, and is approximately 150 feet in width at points shown up."

Defendant, four days before, had written to plaintiff that the property—

"looks like a dandy. I will tell you all about it when I get my samples assayed. I am expressing 9 samples over to the Stowell Drug Company. If they assay high enough I will have the balance assayed when I reach Spokane."

Now, it may be that plaintiff, being informed that the property had been previously turned down by New York financiers, promptly said to defendant, "I can't handle this thing in New York, if it is well known to be thrown up;" and that being his state of mind, confirmed by the low assays of the 9 samples taken from the tunnels, the assays of the remaining samples taken from the surface did not interest him, and he dismissed them from his mind. The surface samples averaged, per ton, $3.93, $8.84, and $15.79, while the tunnel samples averaged $3.30. To an experienced operator in mining property, who wanted

the prospect of a mine to sell, this may not have appeared sufficiently attractive to overcome the other adverse conditions contained in the report of the defendant and plaintiff's own agent, and it may be that plaintiff did in fact turn the prospect down without making any examination of the report of assays of the surface samples.

But in what respect was the defendant at fault in this aspect of the case? Plaintiff testified:

"I knew those 9 samples were there. I supposed Neill had the balance of them. Ronnsavell so wrote, and Neill so told me. I did not ask to see any of those samples, nor attempt to make examination of them, nor did I read the prospectus attached to Ronnsavell's report, nor hardly looked at the report. After it had been turned down by Mr. Neill, I did not pay a bit of attention to that report."

The plaintiff had previously testified that Mr. Neill misled him in not showing him the assays, saying:

"I first learned of these other assays than the 9 about somewhere in the summer of 1920. It was after the lawsuit had been started a long time, when some one of the attorneys obtained from Mr. Stowell a list of assays that were run on the 8th and on the 10th by Mr. Neill. These samples here were run. I knew nothing of it until some time in the summer of 1920, after this suit was started a long time. * * * I didn't know of the fraudulent concealment of these assays at the time the complaint was filed in November, 1919." (The complaint was filed December 4, 1919.)

In other words, the plaintiff did not know, when he filed his complaint, that he had the cause of action against the defendant which he now prosecutes. The only cause of action that plaintiff supposed he had when he commenced this suit was the alleged conduct of defendant in turning down the property. But that was not a cause of action. There was no deception or concealment in that act, if it is conceded to be true. All the facts and elements of the transaction were present, open, and available to the plaintiff, as they were to the defendant, and it was plaintiff's fault if he did not make himself acquainted with all the facts. But did the defendant turn the prospect down?

Defendant testified that he was not in any condition financially to take up the mine and develop it at that time. He was greatly disappointed at plaintiff's action. He did not have any one else in mind with whom he could deal with reference to the mine. It was not until January, 1917, that he had a conference with any one other than the plaintiff in the endeavor to have it taken up. There was nothing done until then to resurrect the proposition. Defendant says:

"All the time I had considerable confidence in the property."

Defendant then got in communication with a Mr. Wood concerning taking over the property, and the latter in turn interested two others; and these four, in March, 1917, secured an option and agreement on the property from Bush, the owner. This agreement resulted in a workable proposition for the development of the mine, which, upon further systematic exploration, proved to be one of great value. This subsequent development by the defendant and his associates attracted the attention of the plaintiff, and is manifestly the underlying cause for this suit.

In the original agreement with the plaintiff, defendant was to share equally with him in the proceeds of the mine, whether worked or sold. In the agreement with Mr. Wood and his two associates, the defendant secured only a one-quarter interest. Is it reasonable to suppose that defendant would deceive and mislead the plaintiff, with whom he was to have a half interest in the property, to depend upon a bare hope that he would find some one to take plaintiff's place? The fact that he did not find such a person is evidence that he did not have any one in view. What he did find was, not a proposition that would give him a half interest in the property, but an agreement with others for a one-quarter interest.

We think the evidence justifies the inference that defendant had no motive for such conduct as is charged against him in the complaint, and that there was no deception or fraud practiced upon the plaintiff in this transaction. There is evidence in the record relating to other questions more or less connected with the transaction and discussed in the briefs, but which do not materially affect the main controversy, and we do not think it necessary to further discuss those questions.

[2] In the course of this opinion we have referred to facts showing the delay on the part of the plaintiff in bringing this suit, notwithstanding his knowledge of the facts and the means of further knowledge within his reach. These facts clearly establish the defense of laches, which would be available to the defendant, if otherwise there was anything in plaintiff's case. As said by the Supreme Court of the United States, in Johnston v. Standard Mining Co., 148 U. S. 360, 370, 13 Sup. Ct. 585, 589 (37 L. Ed. 480):

"* * * The circumstances were such as to put him upon inquiry, and the law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."

There is also the defense that the contract set out in the complaint was invalid under the statute of frauds in British Columbia, and under the laws of that province relative to mining certificates, and is therefore unenforceable in the courts of the United States. While we think this defense might be available to the plaintiff, the circumstances do not call for its application.

We are of the opinion that the judgment of the lower court should be affirmed on the merits; and it is so ordered.